DOUCET, Judge.
The defendant, Advance Transformer Company (Advance), appeals a judgment rendered against it under the Louisiana Products Liability Act (LPLA).
On February 7, 1989, a building located in Leesville, Louisiana and leased to Liberty Military’Sales (LMS) caught fire. As a result of the damages sustained in the fire, Maryland Casualty Company (Maryland), the insurer of LMS, paid LMS $131,822.71, representing fire loss.
Maryland then brought suit against Advance, among others, under theories of redhi-bition and products liability. Maryland alleged that the fire at LMS was caused by the overheating of a defective converter which was incorporated by another defendant, Juno Lighting Co., Inc. (Juno), into a light fixture sold to -LMS.
All defendants other than Advance were dismissed prior to trial. Advance and Maryland stipulated that the amount of damage recoverable was $131,822.71.
After a trial on the merits, judgment was rendered in favor of Maryland and against LMS. The trial judge gave written reasons for his decision. Advance appeals, arguing that Maryland failed to carry its burden of proof under the Louisiana Products Liability Act (LPLA), La.R.S. 9:2800.51 et seq.
La.R.S. 9:2800.54 states that:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.-56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
(4)The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.

MANUFACTURER

Advance first argues that the evidence at trial shows that it is not a manufacturer of the product.
La.R.S. 9:2853(1) defines manufacturer for purposes of the LPLA:
(1) “Manufacturer” means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. “Manufacturing a product” means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. “Manufacturer” also means:
(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.
(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.
(e) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.
(d) A seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the prod *567 uct for resale and the seller is the alter ego of the alien manufacturer. The court shall take into consideration the following in determining whether the seller is the alien manufacturer’s alter ego: whether the seller is affiliated with the alien manufacturer by way of common ownership or control; whether the seller assumes or administers product warranty obligations of the alien manufacturer; whether the seller prepares or modifies the product for distribution; or any other relevant evidence. A “product of an alien manufacturer” is a product that is manufactured outside the United States by a manufacturer who is a citizen of another country or who is organized under the laws of another country.
Mr. Norman C. Grimshaw, the director of technical relations for Advance, testified as follows with regard to construction of the converter alleged by the plaintiff to be the source of the fire: Juno delivers the aluminum housing to Advance. Advance buys two end pieces made to the joint design of Advance and Juno of Zitell, a nylon-like material. Advance assembles the housing and end pieces into a box, into which they place the various components of the converter, which are designed and built by Advance from components purchased on the open market. Finally, they fill the box with polyester sand which is cured to harden it. The converter is then delivered to Juno, which uses it in track lighting systems. The converter is sold only to Juno for use as a component in its fighting systems. Advance is, however, aware that the component enters the stream of commerce as part of Juno’s lighting systems. This testimony indicates that Advance does indeed produce, make, fabricate, construct, or design the converter. Further, since everything but the housing is designed and built by Advance from components available on the open market, Advance exercises control over a characteristic of the design, construction, and quality of the product alleged to have caused the damage. Accordingly, the trial court correctly found Advance to be a manufacturer for purposes of the LPLA.

CAUSATION

Defendant next argues that, plaintiff failed to show that the fire was caused by a defect in the converter.
Causation is a question of fact. In the absence of manifest error, the trial court’s findings should not be disturbed. Dubois v. State Through Dept. of Pub. Safety; 466 So.2d 1381 (La.App. 3 Cir.1985).
The trial judge, in his written reasons for judgment, correctly summarized the trial testimony on causation:
Daniel W. Snow, Jr., a private investigator who had been with the Louisiana Fire Marshall’s Arson Enforcement Division was qualified as an expert in determining the cause and origin of fires. He arrived at the scene of the LMS fire on February 10, 1989, three days after the fire. He interviewed witnesses, including the store manager, made an inspection of the premises and took photographs, exterior and interior.
Snow reached the conclusion that the fire had originated at ceiling level above the jewelry sales counter, the area where the track fighting system was situated (see his diagram P-08, circled in blue). He found several converters, one of which was more damaged than the others, and photographed it (Exhibit PXLB; see also P-09U) (Snow, 115).
Following his initial investigation, he informed his client of his opinion that the fire was “electrical in nature”, and recommended that an engineer be consulted.
Thereafter, when Mr. Snow learned that defendant’s experts disputed his conclusions, he returned to the Leesville area and spoke to Ricky Durrett, Fire Chief of the Sandy Hill Volunteer Fire Department which had responded to the call. He also spoke to Bruce Payton, the person who first saw the fire and reported it. The expert was not permitted to relate what Payton had told him, notwithstanding that Payton was unavailable at the time of trial, having gone to Europe. Snow did testify, however, that his discussions serve to bolster his earlier conclusions.
Jim H. Moore, called by plaintiff, was employed at the time by System Engineering Analysis Laboratories Corporation (SEAL) since 1987 as a facilities engineer. *568 He had a bachelor’s degree, a BS degree in mechanical engineering from Missouri School of Mines and Metallurgy and became a civil engineer in 1966 (University of Missouri at Rolla). He considered himself to be a forensic engineer whose work entailed finding failures in electrical and mechanical devices, as well as other consulting matters. Although he had no degree in electrical engineering he was called upon to examine devices suspected of having caused a fire. Prior to his employment with SEAN he had been a facilities engineer at NASA for Martin Marietta. He was recognized as an expert in the field of mechanical engineering, forensic engineering, in failure mode and analysis pertaining to cause and origin of fires.
Having been contacted on February 16, 1989, Mr. Moore went to the scene the following day, gathered the converters, six or seven in all. Similar to Snow, he regarded one of the converters as having been damaged more than the others, and stated that the photographs P-16 and P-16 A supported the conclusion that the converter which he examined was the converter found by Snow at the scene (elsewhere referred to by him as Item D; same as Exhibit PX 11 B).
In his examination of the suspected converter, Mr. Moore removed a layer of resin with a chisel and found three small holes with charred markings (Moore, 36). Further examination and comparison with another or other converters (see PX-10 H), which had been near the area of the origin of the fire, convinced Moore that the charring continued down into the converter and that the heat came from within the converter. He further concluded that the converter heated internally and that “... this converter started the fire”. (Moore, p. 48)
Marvin Grimshaw of Buffalo Grove, Illinois, an electrical engineer with impressive credentials, testified for the defendant. Formerly with General Electric for over twenty five years, he had been employed by Advance since 1988 and was their Director of Technical Relations. He was accepted without objection as an expert in electronic engineering and the design and construction of lighting equipment.
He conceded that the blamed converter (PX 11 B) was the product of Advance (Grimshaw 190), but testified that the converter in question exceeded the standard specified by the National Electric Code, American National Standards Institute and Underwriters Laboratory. His testimony was to the effect that there was no possible way for the converter to overheat in any failure mode known to him in order to ignite the surrounding building materials (Grimshaw 189,195). He also disputed Mr. Moore’s conclusion concerning the heat holes (Grimshaw p. 215); and was of the opinion that the discoloration was from exterior heat (Grimshaw p. 216).
Mr. Grimshaw put on a demonstration for the court using a track lighting system, including a similar converter, and testified concerning the temperature of various components after several hours of operation. The value thereof, however, was diminished by his admission that the conditions or circumstances surrounding the demonstration were markedly different from those prevailing at the insured’s building at the time of the fire (Grimshaw, 246-248).
There was a circumstance regarding the aluminum track which supports the finding of Snow and Moore that the fire began at the ceiling. The aluminum track (P-ll-A) evidently melted in one area. It was hardly sufficiently explained why, if the heat emanated from the floor level, there was not a more generalized burning of the track. The pertinent testimony of Mr. Grimshaw follows (exerpts from Grimshaw, 251-254):
Q. And if I understand your demonstrative exhibit, this thing would be up on the ceiling kind of like this?
A. I believe that’s correct.
Q. Aluminum melts at 1200, doesn’t it?
A. Pure aluminum at about 1220, yes.
Q. I’m going to hand you part “A” there. Tell me if you see any melting of aluminum there.
A. I believe that it is melting of aluminum. If there is some mixing of the copper and the aluminum that *569 would be a slightly lower temperature, but....
Q. And there’s melting aluminum on part “B”, too, isn’t there, sir?
A. It looks like it got awful close to 1220, yes.
Q. But the melting aluminum on each half of this is limited to one end, isn’t it?
A. Well, this is fractured.
Q. Right. That’s on part “A”.
A. I can’t see that end. That’s somewhat melted, also. That may be both ends.
Q. The point is, you don’t have generalized melting along the course of this — how long is this? If I put them together, how many feet is out here?
A. About five feet.
Q. ... if I were to put them together about how long would they be?
A. About five feet.
Q. And five feet is sixty inches?
A. Yes.
Q. I’m looking here at the Juno cata-logue at a — this is what your Counsel showed you earlier as D-19?
A. Yes.
Q. And I’m looking on a page that begins 2 circuit Track Master.
A. Yes.
Q. Is that the type of lighting fixture we’re talking about here?
A. I believe it’s close, yes.
Q. Now, sir, when you looked at the metal track that we just talked about, there was not generalized melting along the entire length of either piece, was there?
A. No.
Q. There was localized, selective melting, wasn’t there?
A. You could call it that, yes.
Q. And this converter housing assembly and light we’re talking about snaps into that track we’ve been looking at, correct?
A. Twist locks in, yes.
Q. So it is fair to say that, and you would agree, that those track pieces have not been subjected to generalized exposure to 1200 degrees or more?
A. I don’t believe we have enough evidence to say that.
Q. We do have enough evidence to say that just one end’s melted on one of those pieces, don’t you?
A. Yes.
Q. And that there’s not any melting toward the other end, is there?
A. That’s correct.
¾: ⅜ ⅜ ⅜ ⅜ ⅜
Robert Harrison of Rye, Colorado, a consulting engineer specializing in the investigation of fires and explosions for almost forty years testified for the defendant. He was of the opinion that the fire was of incendiary origin. That conclusion was based primarily upon finding two spots of very intense fire at floor level. (D-12 A & B) He said that was attributable to the use of an accelerant. He disputed any possibility of the other “hot spots” being caused by radiant heating, or fall down burning, as offered by the other expert, Snow.
Mr. Harrison became involved in the case in December of 1991 after the building had been renovated. He was never at the scene of the fire and based his conclusions exclusively on the examination of the photographs taken by Snow, Moore and Grimshaw. He questioned no witnesses before reaching the conclusion of arson. He felt that his not seeing the fire scene only “slightly hampered” his investigation, but did concede with some reticence .that Mr. Snow was in a better position than he.
Plaintiffs counsel objected to Mr. Harrison’s being permitted to testify as an expert, not so much as to his general qualifications, but on his not having sufficient information. That objection was overruled by the Court. After reviewing Mr. Harri *570 son’s testimony, the objection somehow seems more valid.
At the risk of repetition, it may be useful to observe that Snow had testified that the hot spots in the floor other than the point of origin were secondary fires caused by fall down and radiant heating; that there was no evidence of arson which persuaded him to depart from his original finding; and that there was no trail burning on the floor as may be expected in an arson case. He did not see with his naked eye conditions such as “alligatoring” attributable to an accelerent which Mr. Harrison claimed to see in the photographs. About the only matter on which these experts (Snow and Harrison) agreed was the lack of usefulness of the device called a sniffer.
Without going into great detail, the testimony of James L. Mazerat, another expert in the investigation and cause of fires, tended to corroborate Snow’s findings.
Although the testimony adduced with regard to the cause of the fire is conflicting, there was sufficient evidence of record to support the trial judge’s conclusion that a defect in Advance’s converter caused the fire. Nor can we say that he was manifestly erroneous in this conclusion.

UNREASONABLY DANGEROUS

Defendant next argues that the plaintiff failed to show that the characteristic of the product which caused the fire was unreasonably dangerous.
La.R.S. 9:2800.55 states that:
A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer’s control, the product deviated in a material way from the manufacturer’s specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.
Grimshaw stated that the converter was designed so that it could not overheat in such a way as to start a fire. He admitted that if it overheated sufficiently to cause a fire, it could not have been manufactured to Advance’s specifications.
La.R.S. 9:2800.56 states in pertinent part that:
A product is unreasonably dangerous in design if, at the time the product left its manufacturer’s control:
(1) There existed an alternative design for the product that was capable of preventing the claimant’s damage; ...
Plaintiffs elicited testimony from Grim-shaw that it would be possible to install a thermal protector on the converter at a cost of approximately $1.00 per unit. A thermal protector could be set to go off if the converter’s interior temperature rose beyond a certain point, thereby preventing the converter from overheating to a point which could ignite a fire. Although Grimshaw opined that no such addition to the converter was necessary because of the existing fuse, we cannot say the trial judge was clearly wrong in concluding that the converter was unreasonably dangerous as defined by the LPLA.
Accordingly, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the defendant.
AFFIRMED.